**Robert Bell et al., Appellees, v. Illinois Farm Supply Company et al., Appellants.**

**Gen. No. 10,220.**

Opinion filed April 20, 1948. Released for publication May 10, 1948.

CASSIDY, SLOAN & CRUTCHER, of Peoria, for appellants.

CLARENCE W. HEYL, of Peoria, and B. JAY KNIGHT, of Rockford, for appellees.

MR. JUSTICE DOVE delivered the opinion of the court.

Appellant, Illinois Farm Supply Company, a corporation, was the owner of a gasoline transport truck and appellant, Lyle E. Walley, was the driver thereof. On the night of March 4, 1946, Walley was driving this truck which consisted of a tractor and two trailers with tanks containing 7800 gallons of gasoline. He left Peoria about six o'clock that evening, driving north on Route 88 intending to go to Princeton, Illinois. He reached a point approximately 26 miles north of Peoria about seven o'clock that evening and at that time and place his truck stopped because the air compressor belt broke, resulting in his brakes locking. The pavement was eighteen feet wide and the truck and trailer were eight feet wide and forty feet long and when the truck stopped it occupied eight feet of the right nine feet of the north traffic lane of the pavement.

On the day in question, appellee, Robert Bell, was driving a Nash 1940 automobile owned by this grandmother, appellee, Nellie Stapleton. He was accompanied by appellee, Lloyd E. Hahn. They had spent the day in Champaign and began the return trip to Morrison, Illinois at approximately 5:00 o'clock in the evening. They reached Peoria between 7:30 and 8:00 o'clock in the evening and left Peoria shortly after eight o'clock. Bell was driving and as he proceeded north on Route 88 he drove his car into the rear end of the stalled transport truck. As a result of the collision Bell and Hahn were injured and the automobile

considerably damaged. To recover for the injuries sustained appellees brought this action.

The case went to trial upon a complaint consisting of six counts, two counts on behalf of each plaintiff, one of which charged specific negligence and the other wilful and wanton misconduct. Answers were filed admitting that the truck was owned and driven as alleged and that it became disabled and stopped as it was proceeding north on Route 88 but denied all charges of negligence and wilful and wanton misconduct. At the conclusion of all the evidence the wilful and wanton counts were withdrawn. The jury awarded Robert Bell $7,000, Lloyd Hahn $3,500, Nellie Stapleton $500. After overruling motions for a new trial and for judgment notwithstanding the verdicts, the trial court rendered judgments upon the several verdicts and defendants appeal.

Lyle E. Walley testified that he was the driver of the International tractor truck with two oil trailers attached, involved in this accident which occurred on Monday evening; that the weight of the truck and trailers was thirty-six tons; that Kingston Mines is between forty and forty-five miles from the scene of the accident and he left there between five and five-thirty o'clock in the evening; that on the previous week-end the truck had been serviced and on the afternoon before he left Kingston Mines he examined the mechanism of the truck, checked the belts, oil, radiator and gasoline and found it to be in normal condition. Mr. Walley further testified that as he was proceeding along the highway and had reached a point about twenty-six miles north of Peoria he heard a strange noise in the motor of the tractor and that shortly thereafter the brakes on the wheels of the tractor and trailers locked and he was unable to proceed. He further testified that he did not start or attempt to start his motor again until approximately an hour after the accident, that as the wheels of the truck and trailers

were locked they could not be moved either forward or back and he did not know of any available means by which the truck and trailers could be moved, that the first notice he had that anything was wrong was when he heard this noise in the motor and immediately thereafter the truck stopped. He further testified that there were at least 27 lights on the truck and trailers, nine of which were on the rear, that all these lights were controlled by four switches, a circuit leading from each switch, one for the headlights, another for the driving or fog lights, another for the two stop lights on the back of the last trailer and the fourth which controlled the clearance lights on the sides and back of the trailers and two lights on the top of the cab in front and seven lights on the rear.

This witness further testified that the lights were all lighted and that immediately after the motor came to a stop he raised the hood and examined the motor and with the aid of his flashlight saw that there were several broken belts and that he would have to call for a repairman to have the same repaired; that within five minutes thereafter, with his flashlight, he was able to get a car driven by Wm. King, who operated a grocery and hardware store at Camp Grove two miles from the scene of the accident, to stop. That King parked his car on the shoulder and together they placed two reflectors to the rear or south of the truck on the east edge of the pavement, placing one about three hundred feet and the other about four hundred feet from the rear end of the truck and placed a third reflector flare to the north or in front of the truck at a distance of 200 feet. That Walley requested King to phone the Supply Company garage at Kingston Mines, between forty and fifty miles from the scene of the accident. King stated that he would and he, King, within ten minutes after the truck had stopped, left and Walley remained with the truck. Walley further testified that during most of the two hours which elapsed

from the time the truck stopped until the accident occurred, he sat in the cab of the truck, that he had a clear view through the wind shield of cars approaching from the north and he could see cars approaching from the rear through the two rear-view mirrors in the cab and as vehicles approached from either direction he operated the light switches and blinked the lights off and on in order to attract attention and warn approaching drivers of the presence of his truck on the pavement.

William King testified that he was driving north on Route 88 about seven o'clock on the evening in question, with his wife and daughter; that it was sprinkling and was dark and when he was about a thousand feet south of where the truck was stalled, he saw at least eight lighted lights on the rear of the truck, some on top, some on each corner and some in the middle; that he drove around the truck and stopped on the shoulder in front and observed headlights and other lighted lights on the front of the truck. This witness corroborated the testimony of Mr. Walley and stated that they placed the three reflector disks, two in the rear and one in front of the stalled truck as testified to by Mr. Walley.

Edna Meyers who lived in the vicinity of Camp Grove, testified that she was in a car with her son and Mrs. Mueller, a neighbor, and the son of Mrs. Mueller, Charles Mueller, who was driving the car. That as they were driving north on this highway about 9:30 in the evening she was in the rear seat of the car with her son and she first observed the truck on the highway when the car in which she was riding was one thousand to twelve hundred feet south of it; that she saw a large number of lights, one reflector light on the highway about 400 feet to the rear of the truck and another, ninety to one hundred feet south of the rear of the truck and another 200 or 300 feet to the north of the front end of the truck. This witness also observed

lighted lights on the rear of the truck, could observe that the truck had stopped and they drove around it to the left and did not stop. The other occupants of this car, Laura Mueller and her son, Charles, testified to the same effect. Charles, who was driving the Meyers car, stated that he observed the stalled truck when he was about a quarter of a mile south of the truck, that there were six or eight lighted lights on the rear of the truck and that there were also flares or lights on the pavement to the rear and that the stalled truck was in his full view after he came over the crest of the hill, approximately one thousand feet south of where the truck had stopped.

John Dalke testified that about 9:30 o'clock upon the evening in question, he was riding in a pick-up truck on Route 88 with Tom Joslin, who was driving. That he was sitting on the right side of the truck which was proceeding south, that he saw the stalled truck on the east side of the highway and observed a reflector flare about 100 feet north of the truck on the east side of the pavement and that the driver was blinking the clearance lights on the truck. This witness further testified that as the automobile which he afterward learned was occupied by appellees, Bell and Hahn, came over the crest of the hill one thousand feet south of the stalled truck, going north, that Joslin stopped the car in which Dalke was riding, on the shoulder, dimmed his lights and they observed the on-coming car as it proceeded north. In the opinion of this witness the Stapleton car was being driven about fifty-five miles per hour from the time he first observed it and without changing its rate of speed ran directly into the rear of the stalled truck. Immediately thereafter Joslin drove south past the wreck and parked on the shoulder and this witness observed the two reflector flares several hundred feet south of the rear of the truck and saw the lighted lights on the rear of the truck and noticed that some of the lights at the base

of the trailer had been broken by the collision. Dalke further testified that the front of the Stapleton automobile was against and under the rear of the truck and that the motor was pushed back about three feet and badly damaged and that it took about 20 minutes to remove Bell and Hahn from the car; that as soon as they were removed he, Dalke, went to the home of L. A. Anderson, about 400 feet south of the stalled truck and telephoned for an ambulance; that he examined the pavement and that there were no skid or tire marks to the rear of the truck and that the left wheels of the Stapleton car were east of the black line.

Pauline Anderson, whose home is located about 100 feet east of the highway and some 400 feet southeast of the point of collision testified that she was in her upstairs bedroom about 9:15 on this evening, preparing to retire. She did not see the accident but testified that she heard a motor racing and looked out the window and saw some small lights on the top of the truck which was standing on the pavement north of her house one-third or one-half of the distance up the incline. A short time later she again looked out the window and did not notice any lights or see any lights on the road back of the truck. She left her bedroom and while brushing her teeth in the bathroom heard a crash. She further testified that thereafter she went down stairs and that Walley, the truck driver, came to her home and she heard Walley request her son to call the police and stated that he was just putting out the flares when the collision occurred. Her testimony is that Walley came to her house twice; the first time about five or ten minutes after the collision and the second time he came some time later and she overheard him say he was going to call his boss and in the phone conversation which followed, Walley stated that the flares were out when the accident occurred. Mr. Walley, the driver of the truck, testified that the men sent by his employer from the garage at Kingston Mines arrived at the

scene of the collision about 15 minutes after the collision occurred, and that he went to the Anderson home only once and that was about forty minutes after the collision.

Appellee, Robert Bell, was the only occurrence witness who testified in behalf of appellees. Appellee Hahn had gone to sleep soon after leaving Peoria and had no recollection of what transpired. Bell testified that the car he was driving belonged to his grandmother, appellee, Nellie Stapleton; that it was in excellent mechanical condition and before the time of the collision his headlights and fog lights were burning; that the highway traversed a rolling country but the pavement was straight, although it was wet and as he drove over the crest of the hill he was 1000 feet south of the point where the truck had stopped which was about one-half way up the ascending grade; that as he proceeded in his proper traffic lane he was driving between 40 and 45 miles per hour and could see about 50 feet ahead as it was misty and foggy. He testified that as he proceeded north he observed no lights, flares or reflectors of any kind. This witness continued: "There were no flares or disks south of the object I ran into. I have a vague recollection of a car coming from the opposite direction. It was on the right side of the road. I did not pay any attention to it. I kept my eyes to my own side of the road. All of a sudden, I saw a dark form. Immediately I slammed on the brakes and tried to turn the wheel to the left and that was the last I remember." On cross-examination Bell testified that he may have been going faster than 40 miles per hour just before and at the time of the collision and that he had no recollection of what occurred after the time he applied his brakes. He was unable to state whether the object which he saw 50 feet ahead of him to the north was moving or had stopped and while he believed he attempted to turn his steering wheel to the left he was not sure and admitted that when his deposition was

taken on March 1, 1947, he stated that he could not say whether the lights on the truck were lighted or not.

Counsel for appellees cite and rely upon *Nystrom v. Chicago, St. Louis Transfer Co.,* 297 Ill. App. 649; *Budds v. Keeshin Motor Exp. Co.,* 326 Ill. App. 59 and *Wise v. Kuehne Mfg. Co.,* 322 Ill. App. 26 and *Barmann v. McConachie,* 289 Ill. App. 196. We have read these cases and also the recent case of *Quirk v. Schramm,* 333 Ill. App. 293, 77 N. E. (2d) 417. The facts in all these cases are clearly distinguishable from the facts in the instant case. In the instant case the testimony discloses that the driver checked his truck less than three hours before it stopped, that it had been serviced in conformity with the regular practice of the company and that without notice or warning of any kind the compressor belt on the truck broke which caused the brakes to lock and the motor to stop as it proceeded north on the east side of the black line of a paved highway in its proper traffic lane. The evidence is that the highway traverses rolling territory and that the truck going north came to rest upon an incline and the crest of the highway to the south was at least one thousand feet south of the point where the truck stopped. The weight of the evidence is that appropriate warning reflector disks were placed on the pavement very shortly after the truck stopped and remained there more than two hours before the collision occurred and were there at the time of the collision and during all this time the truck and trailer were adequately lighted. It further appears that a message was promptly sent by the driver of the truck to his employer, and mechanics from the garage of the Supply Company at Kingston Mines arrived within fifteen minutes after the collision and were engaged approximately one hour in making the necessary repairs. It further appears that the driver of the truck remained with the truck switching the lights off and on in order to notify motorists approaching from the front and rear of the presence of

his truck on the highway and that during the two hour period it was there at least forty trucks and automobiles proceeded north, safely passing this truck.

The only conclusion to be drawn from all of the evidence found in this record is that there was an accidental break in the mechanism of this truck which gave to its operator no choice other than to permit it to remain upon the pavement. It stopped because it became disabled. When it stopped it was adequately lighted and continued to be during the time it remained on the highway and without delay, after it was stopped, warning reflector disks were posted on the highway.

██ Counsel for appellant call our attention to the fact that after the truck had stopped nine witnesses testify to the abundance of light on the front, sides and rear of this truck and also that reflector disks were placed on the highway and that appellee, Bell, is the only one who failed to observe them. From this counsel argue that no reasonable person could possibly believe that the reflector disks were not on the pavement or that the truck was not adequately lighted. In answer to this argument counsel for appellees call our attention to the fact that Bell testified that there were no flares or disks south of the object he ran into, that he saw none and from this his counsel concludes that the jury who heard those nine witnesses who testified as to the presence of the lights and disks and who listened to Bell's testimony believed Bell, "a result" state counsel, "which, we believe, is fully justified when all the contradictions and discrepancies between them is considered." It is true that in estimating the distances in feet from the rear of the truck where the reflector disks had been placed, the testimony of the several witnesses did vary. It is also true that six of the witnesses testified that the color of the reflector disks was red, while one Charles Mueller, the driver of the Meyers car was of the opinion they were yellow and red. It is also true that some of the witnesses said

it was raining, others said it was sprinkling and others that it was misting. Some of the witnesses said it was foggy and others said there was very little fog. These, however, are all minor matters which, in our opinion, are to be expected and are not sufficient to justify a jury in entirely disregarding the evidence of these nine witnesses. We have read all the evidence as abstracted and in our opinion the finding that appellants were guilty of the negligence charged is manifestly against the weight of the evidence.

Under our system of jurisprudence the jury is the fact finding body and this court realizes that the question whether appellants were guilty of the negligence charged and the question whether appellees were in the exercise of due care are questions of fact. This court hesitates to conclude that a jury acted unreasonably (*Walter v. City of Rockford,* 332 Ill. App. 243) but under the authorities it is our duty to reverse a judgment, if from a consideration of the record, we conclude that the judgment appealed from is against the weight of the evidence (*Russell v. Consolidated Forwarding Corp., Inc.,* 330 Ill. App. 529).

In view of the conclusion we have reached it is unnecessary to consider the other errors relied upon for reversal. The judgments of the circuit court of Peoria county are reversed and the cause remanded.

*Reversed and remanded.*